UNTIED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES,
COUNCIL 25, as an organization and
Representative of its members, CATHERINE
PHILLIPS and CHARLES WILLIAMS,

      Plaintiffs,                              File No. 2:08-cv-14370

v                                      HON. PATRICK J. DUGGAN

TERRI LYNN LAND, MICHIGAN SECRETARY,     MAGISTRATE STEVEN D PEPE
OF STATE, and CHRISTOPHER M. THOMAS,
DIRECTOR OF BUREAU OF ELECTIONS, in
their official capacities,

      Defendants.
_____/

Herbert A. Sanders (P43031)        Margaret Nelson (P30342)
The Sanders Law Firm, P.C.         Heather S. Meingast (P55439)
Attorney for Plaintiffs             John Fedynsky (P65323)
635 Beaubien                  Assistant Attorneys General
Detroit, MI 48226             Attorneys for Defendants Land & Thomas
313.962.0099                   PO Box 30736
                                Lansing, Michigan  48909
Aina N. Watkins (P69196)         517.373.6434
Staff Attorney for Plaintiff AFSCME
600 W. Lafayette, Ste. 500
Detroit, MI 48226
313.964.1711 ext. 237
_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO "PLAINTIFFS' EX PARTE MOTION FOR DECLARATORY JUDGMENT, PRELIMINARY INJUNCTION, PERMANENT INJUNCTION AND EXPEDITED CONSIDERATION"**

## CONCISE STATEMENT OF ISSUES PRESENTED

I.   Plaintiffs lack standing to sue.

II.  The Court should decline to exercise jurisdiction over Plaintiffs' claim for declaratory relief.

III. The elements for granting or denying a motion for preliminary injunction do not weigh in favor of granting Plaintiffs' motion.

IV.  Laches doctrine bars Plaintiffs' claims.

V.   Ripeness doctrine bars Plaintiffs' claims.

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

Cases

*Abbott Laboratories v Gardner*, 387 US 136 (1967) ................................................................. 32

*Anderson v Celebrezze*, 460 US 780; 103 S Ct 1564; 75 L Ed 2d 547 (1983). ..................... 18, 22

*Blackburn v Fisk University*, 443 F2d 121 (CA6 1971) ............................................................. 17

*Burdick v Takushi*, 504 US 428; 112 S Ct 2059; 119 L Ed 2d 245 (1992) .................................. 18

*Burson v Freeman*, 504 US 191; 112 S Ct 1846; 119 L Ed 2d 5 (1992) .................................... 21

*Celotex Corp v Catrett*, 477 US 317; 106 S. Ct. 2548; 91 L Ed 2d 265 (1986) .......................... 17

*Cleveland Branch, NAACP v City of Parma*, 263 F3d 513 (CA 6 2001) ...................................... 5

*Costello v United States*, 365 U.S. 265, 5 L Ed 2d 551; 81 S Ct 534 (1961) .............................. 30

Cotz v Mastroeni, et al, 476 F Supp 2d 332 (SD NY 2007) ........................................................ 17

*CSX Transp, Inc v Tennessee State Bd of Equalization*, 964 F2d 548 (CA6 1992) .................... 14

*Eu v San Francisco Cty Democratic Central Comm*, 489 US 214; 103 L Ed 2d 271; 109 S Ct 1013 (1989) .............................................................................................................................. 22

*Friends of the Earth, Inc v Laidlaw Envtl Defenders of Wildlife*, 528 US 167; 120 S Ct 693; 145 L Ed 2d 610 (2000) .................................................................................................................. 5

*Grand Trunk Western RR Co v Consolidated Rail Corp*, 746 F2d 323 (CA 6 1984) ................. 10

*Greater Cincinnati Coalition for the Homeless v Cincinnati*, 56 F3d 710 (6th Cir 1995) ........... 9

*In re Dolorean Motor Co*, 755 F2d 1223 (CA 6 1985) ............................................................... 14

*Kansas v. Colorado*, 514 U.S. 673; 115 S Ct 1733; 131 L Ed 2d 759 (1995) ............................ 30

*Kay v Austin*, 621 F2d 809 (CA6 1980) ..................................................................................... 30

*Keweenaw Bay Indian Community v Michigan*, 11 F3d 1341 (CA 6 1993) ................................ 13

*Lujan v Defenders of Wildlife*, 504 US 555; 112 S Ct 2130; 119 L Ed 2d 351 (1992) ................ 5

*Matsushita Electric Industrial Co v Zenith Radio Corp*, 475 US 574; 106 S Ct 1348; 89 L Ed 2d 538 (1986) .............................................................................................................................. 17

*Norman v Reed*, 502 US 279; 112 S Ct 698; 116 L Ed 2d 711 (1992) ....................................... 19

*Northeast Ohio Coalition for the Homeless v Blackwell*, 467 F3d 999 (CA 6 2006) ................... 8

*Perry Ed Assn v Perry Local Educators' Assn*, 460 US 37; 103 S Ct 948; 74 L Ed 2d 794 (1983) ...................................................................................................................................... 22

*Public Service Comm'n of Utah v Wycoff*, 344 US 237; 73 S Ct 236; 97 L Ed 291 (1952) ......... 10

*Purcell v Gonzalez*, 127 S Ct 5 (2006) ..................................................................................... 31

*Regional Rail Reorganization Act Cases*, 419 US 102 (1974) .................................................. 32

*Reynolds v Sims*, 377 US 533; 12 L Ed 2d 506; 84 S Ct 1362 (1964) ................................. 22, 31

*SBC Mich v PSC (In re Complaint of Rovas)*, 482 Mich. 90, 754 NW2d 259 (2008) ................. 13

*Sierra Club v Morton*, 405 US 727 (1972) ................................................................................... 9

*Six Clinics Holding Corp, II v Cafcomp Sys, Inc*, 119 F3d 393 (CA6 1997) .............................. 14

*Southwest Voter Registration Educ Project v Shelley*, 344 F3d 914 (CA9 2003) ...................... 14

*Texas v United States*, 523 US 296; 118 S Ct 1257; 140 L Ed 2d 406 (1998) ............................ 32

Thaddeus-X v Blatter, 175 F3d 378 (CA6 1999) ........................................................................ 17

*Thomas v Union Carbide Agric Prods Co*, 473 US 568; 105 S Ct 3325; 87 L Ed 2d 409 (1985) 32

*Timmons v Twin Cities Area New Party*, 520 US 351 (1997). .................................................... 11

*Tinker v Des Moines Indep Cmty Sch Dist*, 393 US 503; 89 S Ct 733; 21 L Ed 2d 731 (1969). . 28

*United Food & Commer Workers Union Local 751, Petitioner v Brown Group*, 517 US 544; 116 S Ct 1529; 134 L Ed (1996) ................................................................................................... 9

*Virginia v Hicks*, 539 US 113; 123 SCt 2191; 156 Led 2d 148 (2003) ...................................... 20

ii

*Washington v Reno*, 35 F3d 1093 (CA 6 1994) ................................................................ 13

*Williams v Rhodes*, 393 US 23 (1968) ............................................................................ 31

Statutes

28 USC § 2201 .................................................................................................................. 10

42 USC § 1971 .................................................................................................................. 16

42 USC § 1973 .................................................................................................................. 16

MCL 168.744 .................................................................................................................... 11

Tenn Code Ann § 2-7-111(b) ............................................................................................ 23

## STATEMENT OF THE FACTS

On October 15, 2008, Plaintiffs American Federation of State, County and Municipal Employees, Council 25 ("AFSCME"), Catherine Phillips and Charles Williams filed the instant complaint against Secretary of State Terri Lynn Land and Director of Elections Christopher Thomas in their official capacities.  Plaintiffs seek immediate and permanent declaratory and injunctive relief, asserting, primarily, that these defendants are violating the Voting Rights Act, and State law, MCL 168.744, by instructing local election officials that they have the right to ask voters entering polling places to remove campaign buttons or cover up clothing bearing a campaign slogan or a candidate's name ("the Directive").

The Directive appears on page 51 of the 183-page Election Inspector training manual that Defendants promulgated in February 2008.[1]  The manual addresses sixteen topics and Topic 7 is "Campaigning at the Polls and Exit Pollsters."  (Manual at 51-52.)  Topic 7 describes various electioneering behavior that is forbidden "within 100 feet of any doorway being used by voters to enter the building in which a polling is taking place."  (Manual at 51.)  Plaintiffs challenge two specific portions of Topic 7:

> Election Inspectors have the right to ask voters entering the polls to remove campaign buttons or cover up clothing bearing a campaign slogan or a candidate's name.

<div align="center">* * *</div>

> If a person persists in violating any of the above restrictions, contact the clerk or, if necessary, local law enforcement authorities.

(Manual at 51).  These instructions are the same or consistent with instructions issued on this topic in years past.  (Defs.' Ex. 1, Thomas Aff. at ¶¶5, 6).

---

[1] As of the filing date of this motion, the full training manual is accessible at the following link http://www.michigan.gov/documents/sos/5revised_manual_9-10_209104_7.pdf

Plaintiffs also assert violations of the First, Fifth, Fourteenth and Fifteenth Amendments to the United States Constitution, (Compl. at ¶¶ 1-2), but it is unclear if the challenge is facial, as applied or both.  Despite the absence of any historical problems with Defendants' longstanding enforcement of reasonable time, place and manner restrictions for polling places, Plaintiffs filed this six-count action and an ex parte motion less than three weeks before the November 4, 2008 general election.[2]  The Directive is based on MCL 168.744, which was first effective in 1955 and amended in 1972 and 1996.

Plaintiff AFSCME is a labor union, with over 90,000 members in Michigan and brings this action as an organization and in its representative capacity.  (Compl. at ¶¶ 6-7.)  Plaintiffs Charles Williams and Catherine Phillips are registered voters, African American and members of AFSCME Council 25 who intend to wear campaign buttons and shirts when they vote, regardless of their knowledge of the Directive.  (Compl. at ¶¶ 12-14.)  Albert Garrett, President of AFSCME, Council 25, avers that other members of AFSCME intend on Election Day to appear at polling places to vote while wearing buttons and shirts supporting various candidates and issues on the ballot.  (Garret Aff. at ¶¶ 1, 5-6, Pls.' Ex. 4.)  He feels the Directive "if carried out" creates "the possibility" that the enforcement by local election officials will be discriminatory or inconsistent, resulting in the deprivation of various constitutional rights to AFSCME members, including their right to vote and their right to free speech.  (Garret Aff. at ¶¶ 9-12, Pls.' Ex. 4.)  Plaintiffs Williams and Phillips filed substantively identical affidavits affirming that "[t]he purpose of my wearing buttons and shirts that will evidence my support of particular issues and/or candidates will be to urge others to participate in the voting process."  (Williams Aff. at ¶ 3, Pls.' Ex. 5; Phillips Aff. at ¶ 4, Pls.' Ex. 6.)  Both assert that the Directive is "intimidating and

---

[2] Plaintiffs filed amended exhibits to their motion on October 16, 2008.  Defendants will refer to these exhibits when citing to the record.

threatening, and I feel that it will be used to arbitrarily deny or abridge my right to vote because I am African American."  (Williams Aff. at ¶ 5, Pls.' Ex. 5; Phillips Aff. at ¶ 4, Pls.' Ex. 5.)

 Plaintiffs offer no other evidence supporting their claims that any individual ever was, or will be, injured by the Directive.  Defendants are aware of no previous incidents, police reports or other problematic enforcement among the millions of Michigan voters who cast ballots in previous primary and general elections when Election Inspectors operated under the same or similar instructions with respect to this issue.  (Defs.' Ex. 1, ¶8).  There is simply no evidence to suggest that the Directive has or will be enforced inconsistently, arbitrarily, discriminatorily or otherwise improperly by local election officials.

## ARGUMENT

### Introduction

The Court should decline to exercise jurisdiction over this case because Plaintiffs lack standing. The Court in its discretion should also decline jurisdiction because of a strong likelihood of friction between federal and state law and the fact that granting relief in this declaratory action would not serve a useful purpose or bring an end to the controversy. Further, Defendants' instruction that Election Inspectors have the right to ask voters entering the polls to remove campaign buttons or cover up clothing bearing a campaign slogan or a candidate's name runs afoul of no federal or State law, constitutional or otherwise. Indeed, it is consistent with the language of MCL 168.744. Further, it is a reasonable time, place and manner restriction that balances, in a narrowly tailored manner, the right to political speech and the State's compelling interest in ensuring the efficacy and integrity of the voting process and the prevention of election fraud and voter intimidation. Assuming jurisdiction exists, Plaintiffs' claims fail on the merits because the factors for granting or denying a preliminary injunction weigh in favor of Defendants. Further, the applicable law, evidence and arguments Plaintiffs present do not support the request of summary judgment under FRCivP 56(c) and the issuance of a declaratory judgment and permanent injunction. Finally, the doctrine of laches bars consideration of the complaint and any alleged controversy is not yet ripe.

### I. Plaintiffs lack standing both as an organization and as individuals.

Plaintiffs assert that they have both individual and associational standing to bring these claims. (Pls.' Br. at 10-11). The applicable laws compel the opposite conclusion.

A.    <u>Plaintiffs Williams and Phillips Lack Individual Standing</u>

To satisfy the standing requirements of Article III, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and it is likely as opposed to merely speculative, that the injury will be redressed by a favorable decision.[3]

Plaintiffs' complaint and motion fall far short of the standing requirements.  Plaintiffs raise the specter of disenfranchisement and denial of free speech.  Their pleadings are replete with qualifiers that can only be read to admit the speculative, hypothetical and conjectural nature of their injuries.  "Plaintiffs and other Michigan residents *may suffer* irreparable injury by having their right to vote abridged and/or denied."  (Pls.' Br. at 10) (emphasis added).  "[T]he *possibility exist* [sic] that such broad authority will be used in a [sic] arbitrary, discriminatory and/or inconsistent manner . . . ." (Pls.' Br. at 18) (emphasis added).  AFSCME President Garrett raises the same "*possibility*," refers to the Directive "*if carried out*" and reports that his union's "members *feel* that the directive given to the Election Inspectors by the Defendants intimidates, threatens or coerces our members . . . ."  (Garrett Aff. at ¶¶ 9-11, Pls.' Ex. 4 (emphasis added).)  Similarly, Williams and Philips "*feel* that [the Directive] will be used to arbitrarily deny or abridge my right to vote because I am an African American."  (Williams Aff. at ¶ 5, Pls.' Ex. 5; Phillips Aff. at ¶ 4, Pls.' Ex. 5.)  Mere expression of subjective feelings cannot suffice under the applicable principles of standing even in the First Amendment context.[4]  There are no facts

---

[3]*Cleveland Branch, NAACP v City of Parma*, 263 F3d 513, 523-524 (CA 6 2001) (quoting *Friends of the Earth, Inc v Laidlaw Envtl Defenders of Wildlife*, 528 US 167, 180-81; 120 S Ct 693; 145 L Ed 2d 610 (2000)) (quoting *Lujan v Defenders of Wildlife*, 504 US 555, 560-61; 112 S Ct 2130; 119 L Ed 2d 351 (1992)).

[4] *See Cleveland Branch*, 263 F3d at 523-24;  *Grendell v Ohio Supreme Court*, 252 F3d 828, 834-835 (CA6, 2001)

before the Court that, if true, would tend to show that such feelings are well-founded and that the claimed injuries are real and imminent, as opposed to hypothetical and speculative.

Plaintiffs' parade of horribles lacks all manner of factual predicate. The denial of the right to vote is not a fact in evidence, but merely Plaintiffs' unsubstantiated assertion. Another unfounded assumption is Plaintiff's insistence that enforcement of the Directive will be or might be arbitrary and discriminatory. There is no evidence that enforcement of the Directive can be so described or expected or, relatedly, that such enforcement ever prevented an individual from casting a vote. The facts of each discrete case would necessarily drive any decision by a local Election Inspector. Factors to consider include the level of disturbance caused by the violation, the flagrancy of the violation, the presence of other voters and the length of the queue, the degree to which those voters' rights are being impeded and the impact upon how orderly and efficaciously the polling place is able to operate as a whole. Defendants submit that contacting law enforcement is a clear last resort, and Plaintiffs have offered nothing to show otherwise apart from their own personal fears. There is thus no causal connection between the alleged wrong and the assumed deprivation.

Redress is also problematic. Any injunctive relief would be both redundant and nugatory, as it would instruct Defendants to (1) refrain from doing what they have not done (disenfranchise voters) and (2) continue to do what they have done (refrain from disenfranchising voters). Because the Directive has injured no one, enjoining its enforcement would serve no end.

As a practical matter, the Court should be mindful of the narrow reach of the Directive. These considerations apply equally to the merits argument below, but they also can inform the Court's analysis of standing. The Directive is limited in time to the thirteen hours of the handful of days a year when the people of Michigan go to vote. For individual voters, the time is further

constrained to the short period of time between when they enter, vote and then exit the polls. Similarly, the Directive is confined in space to the immediate vicinity of and within polling places. Finally, there is no automatic or express sanction that requires election officials to precipitously deny anyone the right to vote. Further, Plaintiffs Williams' and Phillips' stated purpose for wearing the campaign materials inside the polling place, "to urge others to participate in the voting process," is not stifled because those people inside the polling place are already participating. There is no injury in fact.

Compliance with the Directive is temporary and easy, as campaign buttons, hats and other small accessories can be removed and placed out of sight with little difficulty. If November weather is, consistent with previous experience, chilly as expected, then covering campaign clothing is as simple as closing a winter overcoat. For this purpose, election officials might loan out extra coats or coverings on a temporary basis, much like a restaurant or a religious attraction that adheres to a strict dress code. In the absence of such garments, election officials can direct the voter to a nearby bathroom or other private area where such clothing could be turned inside out. Voters wearing multiple layers of clothes can simply remove the prohibited article. If these options are impracticable and time allows, then in the rare case a voter might be instructed to return home to change clothes. This inconvenience is justified, as explained below, for the reasons that underlie the State's compelling interest in ensuring the integrity of the voting process, providing a safe voting environment free from electioneering and campaigning and preventing election fraud and voter intimidation. The limited practical effect of the Directive undercuts Plaintiffs' contention that any injury in fact is present in this case.

Plaintiffs have no basis to assume that extreme coercion would be the rule. Indeed, the very terms of the Directive mention calling the local clerk before contacting law enforcement and only *after* a person *persists* in violating any restrictions. Plaintiffs' theory of injury skips the

first several reasonable steps that voters and election officials alike can take together to make the Directive work as intended.  Plaintiffs' attempt to cast the Directive in the most extreme light betrays their reliance on conjecture, speculation and hypothesizing to satisfy the injury in fact requirement.  The narrow reach of the Directive ensures that Plaintiffs' tenuous assertion of standing is unpersuasive and should be rejected.

Plaintiffs' assertion of an overbreadth challenge here does not avoid this statutory requirement either.  While the First Amendment overbreadth doctrine is a recognized exception to the consideration of prudential standing,[5] the First Amendment overbreadth doctrine does not excuse Plaintiffs from establishing the requisite constitutional standing required by Article III.[6] Plaintiffs fail in all respects to establish the requisite injury in fact and causal relation to the Directive and, thus, lack standing to bring any asserted claims.

C.    Plaintiff AFSCME Lacks Organizational Standing

1.    *AFSCME lacks standing in its own right.*

To bring suit on behalf of its members, an organization must show "'its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"[7]  An organization has standing when its members have sustained a "direct and sufficient" injury, the organization is devoted to representing its members' interests, and the members are not needed individually for just

---

[5] *Brandywine, Inc v City of Richmond*, 359 F3d 830, 835 (CA6, 2004); *Leonardson v City of East Lansing*, 896 F2d 190, 195 (CA6, 1990)(quoting *NAACP v Button*, 371 US 415, 433 (1963)).
[6] *Broaderick v Oklahoma*, 413 US 601, 612; 93 SCt 2908; 37 LED2d 830 (1973).
[7] *Cleveland Branch*, 263 F3d at 524 (quoting *Friends of the Earth*, 528 US at 181); *see also Northeast Ohio Coalition for the Homeless v Blackwell*, 467 F3d 999, 1010 (CA 6 2006).

adjudication.[8]  The test's third prong is prudential and discretionary, and therefore not required, but may be of importance and should be considered where appropriate.[9]

With respect to standing as an organization, AFSCME has not demonstrated that the procedures of which it complains have or will lead to a concrete and particularized injury to it as an organization.  AFSCME stands in the same position as the homeless advocacy group and labor union that lacked organizational standing to challenge voter identification laws for absentee ballots in the *Northeast Ohio Coalition* case.[10]  That labor union there also engaged in "voter registration and other election activities on behalf of its members."[11]  The Sixth Circuit held that "[t]he scanty information about the plaintiff organizations in the complaint also raises substantial questions about whether the interests at stake here are germane to the organizations' purposes, which clearly are not primarily related to election or voters' rights issues."[12]

In this case, Plaintiffs assert that the Directive will somehow frustrate AFSCME's mission as a union.  (Pls.' Br. at 11.)  But the analysis of *Northeast Ohio Coalition* disputes that assertion.  Further, "a mere interest in a problem is not . . . sufficient to confer standing on an organization."[13]  There is a failure to show an adequate impact upon AFSCME's interests as a whole.  The purely hypothetical, conjectural and speculative injuries that are alleged do not satisfy the injury-in-fact requirement.

---

[8] *Hunt*, 432 US at 343-344.
[9] *United Food & Commer Workers Union Local 751, Petitioner v Brown Group*, 517 US 544, 555; 116 S Ct 1529; 134 L Ed (1996).
[10] *Northeast Ohio Coalition*, 467 F3d at 1010.
[11] *Northeast Ohio Coalition*, 467 F3d at 1010.
[12] *Northeast Ohio Coalition*, 467 F3d at 1010.
[13] *Greater Cincinnati Coalition for the Homeless v Cincinnati*, 56 F3d 710, 716 (CA 6 1995 (citing *Sierra Club v Morton*, 405 US 727, 739 (1972)).

2.    *AFSCME lacks standing in a representative capacity*

An organization suing as representative must include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association.[14] AFSCME has not done so in this case, as Williams and Phillips fail to bring forth any particularized harm in their individual capacities.  AFSCME also fails to demonstrate that any of their members would have standing to sue in this case because they have not sufficiently demonstrated that any member is likely to suffer a concrete and particularized injury.  AFSCME has not demonstrated that there is any real imminent threat that one of its members has been or will have their right to vote denied.  Furthermore, AFSCME cannot establish the causation and redressability requirements for the reasons previously stated with respect to Williams and Phillips.  Accordingly, AFSCME has failed to demonstrate standing to proceed on behalf of their members as well.

**II.  This Court should decline to exercise jurisdiction over Plaintiffs' request for declaratory judgment**

The Declaratory Judgment Act provides that in a case of actual controversy, a competent court may "declare the rights and other legal relations" of a party "whether or not further relief is or could be sought."[15]  It is well-settled, that the granting of a declaratory judgment rests in the sound discretion of the court and the court may refuse to hear such a claim.[16]  There are two principal criteria used in determining whether a declaratory ruling is appropriate:  1) whether the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and 2)

---

[14] *United Food*, 517 US at 555.
[15] 28 USC § 2201; *Public Service Comm'n of Utah v Wycoff*, 344 US 237, 241; 73 S Ct 236; 97 L Ed 291 (1952).
[16] *Grand Trunk Western RR Co v Consolidated Rail Corp*, 746 F2d 323, 326 (CA 6 1984) (citing C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2759 at 645 (1983).

when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.[17]

The Sixth Circuit considers the following factors in determining whether it is appropriate for a district court to issue a declaratory ruling:  (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for *res judicata*;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and, (5) whether there is an alternative remedy which is better or more effective.[18]

Applying these factors to the instant case, this Court should use its discretion to deny declaratory relief.   Unnecessary federal intervention into State and local election practices would create unjustifiable friction between federal and State courts.  "States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election – and campaign – related disorder."[19]  While Plaintiffs appear to raise various federal issues in this case, the key issue is a dispute over Defendants' interpretation of state law not the state law itself.  The Directive is a guideline crafted to implement the State's longstanding statutory ban on campaigning and electioneering within 100 feet of any entrance to the building where polling is taking place[20]:

---

[17] *Grand Trunk*, 746 F2d at 326 (CA 6, 1984) (citing E. Borchard, DECLARATORY JUDGMENTS 299 (2d Ed 1941).

[18] *Grand Trunk*, 746 F2d at 326 (citing 6A Moore's Federal Practice para. 57.08[2] at 57-37 (1983)).

[19] *Timmons v Twin Cities Area New Party*, 520 US 351, 358 (1997).

[20] MCL 168.744 (emphasis added).

(1) An election inspector or *any other person* in the polling room or in a compartment connected to the polling room or within 100 feet from any entrance to the building in which the polling place is located shall not persuade or endeavor to persuade a person to vote for or against any particular candidate or party ticket, or for or against any ballot question that is being voted on at the election. A person shall not place or distribute stickers, other than stickers provided by the election officials pursuant to law, in the polling room or in a compartment connected to the polling room or within 100 feet from any entrance to the building in which the polling place is located.

\* \* \*

(3) On election day, *a person shall not post, display*, or distribute in a polling place, in any hallway used by voters to enter or exit a polling place, or within 100 feet of an entrance to a building in which a polling place is located *any material that directly or indirectly makes reference to an election, a candidate, or a ballot question*. This subsection does not apply to official material that is required by law to be posted, displayed, or distributed in a polling place on election day.

The core issue in this case, therefore, is one of statutory construction by a state administrative agency charged with the relevant regulatory responsibility.

Specifically, the question is whether the Directive is consistent with the prohibited activity described in MCL 168.744. Count I of the Complaint alleges that Defendants have violated this State statute and "misinterpreted the prohibited acts as delineated in MCL 168.744 to prohibit the wearing of 'campaign buttons, or clothing bearing a campaign slogan or a candidate's name.'" (Compl. at ¶ 41 (quoting the Directive)). Plaintiffs contend that the statute "does not prohibit the mere wearing of campaign buttons or clothing bearing a campaign slogan or a candidate's name," contrary to the plain terms of the statute, as discussed below. (Compl. at ¶ 44). For purposes of declaratory judgment, however, this Court need not intervene to decide this State law dispute. The matter is more properly left to State courts to decide as a matter of State law if Plaintiffs' claim under the statute is viable. In this context, a federal district court in its discretion should not enter the fray because there is a high likelihood that such intervention would cause friction between the federal and State systems.

Declaratory judgment would not serve a useful purpose in clarifying and settling the legal relations at issue because it is the province of Michigan courts to construe Michigan statutes with finality.  Any federal interpretation of MCL 168.744 would leave room for a different and perhaps more narrow construction in State court.  Consequently, declaratory judgment would not terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to this proceeding.  The Complaint inescapably seeks a determination of the meaning and reach of MCL 168.744.  Plaintiffs rely solely on Defendants' alleged interpretation of the statute, which, they concede in their motion, is not binding upon Michigan's courts.  (Pls.' Br. at 14).[21]  Plaintiffs fail to cite any Michigan case interpreting the statute at issue.  This Court is thus left to guess how a court in Michigan would interpret the statute and what difference, if any, there would be with the agency interpretation Plaintiffs challenge here.  There is thus an unavoidable gap between the federal issues that Plaintiffs seek to litigate and the foundational matter of Michigan's construction of its own statute.  Under these circumstances, a federal court should make no declaration on a State law that has not yet been properly challenged in State court or of the state agency's interpretation of that law which is facially valid and neutral and where, as here, application will be fact and incident specific.

### III.    The factors for granting or denying a preliminary injunction do not weigh in favor of granting Plaintiffs' Motion

A.    Standards for issuing a preliminary injunction.

When determining whether to issue a preliminary injunction, this Court must consider four factors[22]:

---

[21] *SBC Mich v PSC (In re Complaint of Rovas)*, 482 Mich. 90, 754 NW2d 259, 267 (2008) (holding that "the agency's interpretation is not binding on the courts, and it cannot conflict with the Legislature's intent as expressed in the language of the statute at issue.")

[22] *Washington v Reno*, 35 F3d 1093, 1099 (CA 6 1994) (citing *Keweenaw Bay Indian Community v Michigan*, 11 F3d 1341, 1348 (CA 6 1993)).

(1) the likelihood that the party seeking the preliminary injunction will succeed on the merits of the claim; (2) whether the party seeking the injunction will suffer irreparable harm without the grant of the extraordinary relief; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest is advanced by the issuance of the injunction.

"A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue."[23]  The decision of whether to issue a preliminary injunction lies within the discretion of the district court.[24]  "[T]he less certain the district court is of the likelihood of success on the merits" of the claims, the greater the burden on the plaintiff to "convince [it] that the public interest and the balance of hardships tips in [plaintiffs'] favor."[25]

      B.      <u>There is no likelihood that Plaintiffs will succeed on the merits of their claims.</u>

For the reasons stated above, Plaintiffs have no likelihood of success on the merits because they should not reach the merits in the first place.  Defendants adopt and incorporate by reference their arguments concerning standing and declaratory judgment jurisdiction.  The doctrines of laches and ripeness, which are argued below, also allow Plaintiffs no likelihood of success on the merits.

      *1.*      *The Directive does not violate State law*

Plaintiffs argue that the Directive violates MCL 168.744 because simple display of campaign material is not an overt act of campaigning contemplated by the statute.  But this argument amplifies one part of the statute while ignoring another part of the text.  Subsection 1 states that any "person" within the polling area "shall not persuade or endeavor to persuade a person to vote for or against any particular candidate or party ticket, or for or against any ballot

---

[23] *Six Clinics Holding Corp, II v Cafcomp Sys, Inc*, 119 F3d 393, 399 (CA6 1997) (citing *In re Dolorean Motor Co*, 755 F2d 1223, 1228 (CA6 1985)).
[24] *CSX Transp, Inc v Tennessee State Bd of Equalization*, 964 F2d 548, 552 (CA6 1992).
[25] *Southwest Voter Registration Educ Project v Shelley*, 344 F3d 914, 917 (CA9 2003).

question that is being voted on at the election."[26]  The plain meaning of this prohibition

encompasses displays of campaign material.  One purpose for wearing campaign material is to

persuade someone else to vote for that candidate or position.  Persuasion – or at least the attempt

thereof – is the necessary effect of displaying campaign material because such display inherently

communicates a personal endorsement of that candidate or issue.  There may not be direct

advocacy, but this form of "passive campaigning" certainly conveys the message of support for

the candidate or position and a desire to persuade other to support that point of view.  The

Directive is thus a reasonable and consistent implementation of Subsection 1.

Further, Plaintiffs' argument ignores the plain language of Subsection (3) of the statute,

which carries the following prohibition[27]:

> On election day, *a person shall not post, display*, or distribute in a polling place,
> in any hallway used by voters to enter or exit a polling place, or within 100 feet of
> an entrance to a building in which a polling place is located *any material that
> directly or indirectly makes reference to an election, a candidate, or a ballot
> question*.

The Directive falls within the plain terms of Subsection 3, which prohibits the simple display of

campaign material in the polling place or within the 100-foot zone surrounding it.  Wearing

campaign material in a visible way is displaying it, and violates this subsection.  The Directive

does not require or compel the election official to remove an individual openly displaying

campaign material or to deny them the opportunity to vote.  (Def's Ex 1, ¶¶5, 7)  Indeed, election

officials are trained to use the least intrusive means to obtain compliance.  Plaintiffs thus have no

likelihood of success on the merits of their argument that the Directive, which is a

straightforward implementation of MCL 168.744, somehow violates the very statute it is

designed to serve.

---

[26] MCL 168.744(1).
[27] MCL 168.744(3) (emphasis added).

2.      *The Directive does not violate the Voting Rights Act*

There is no merit in Plaintiff's argument that the Directive violates the Voting Rights

Act.  Plaintiffs rely on 42 USC §§ 1971 and 1973, which state, respectively[28]:

> No person, whether acting under color of law or otherwise, shall intimidate,
> threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for
> the purpose of interfering with the right of such other person to vote or to vote as
> he may choose . . . .

And[29]:

> (a) No voting qualification or prerequisite to voting or standard, practice, or
> procedure shall be imposed or applied by any State or political subdivision in a
> manner which results in a denial or abridgement of the right of any citizen of the
> United States to vote on account of race or color, or in contravention of the
> guarantees set forth in section 4(f)(2) [42 USCS § 1973b(f)(2)], as provided in
> subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of
> circumstances, it is shown that the political processes leading to nomination or
> election in the State or political subdivision are not equally open to participation
> by members of a class of citizens protected by subsection (a) in that its members
> have less opportunity than other members of the electorate to participate in the
> political process and to elect representatives of their choice.

For the reasons already stated, there is no reason to believe Plaintiffs' assertion that the Directive

has ever resulted, or will ever result, in interference with any individual's right to vote.  No

incident has ever been reported to the Secretary of State where an individual has been removed

from or denied the right to vote due to a violation of this state law.  (Defs' Ex 1, ¶8)  The

Directive merely establishes basic ground rules for the manner in which the right to vote is

exercised at a polling place, a public environment that government officials are nonetheless

charged with controlling and regulating.  The Directive is, as argued below, a narrowly tailored

viewpoint neutral restriction that serves the compelling interests of safeguarding the integrity of

the voting process and preventing election fraud and voter intimidation.  Consistent with that

---

[28] 42 USC § 1971.
[29] 42 USC § 1973.

purpose, the Directive upholds § 1971 because it designates a limited zone in the polling place where individual voters may not threaten, coerce or otherwise interfere with other voters' right to cast a ballot free from distraction, compulsion or other efforts, however slight, at influencing their votes.  The rights protected in § 1971 are the rights that underlie Defendants' compelling interest in an orderly election process.  The governmental interests are thus grounded in the interests of individual voters.  Defendants must craft a careful balance on Election Day of the right to vote and the right to free speech.  Plaintiffs' conclusory invocation of § 1971 has no likelihood of succeeding on the merits.

Plaintiffs' argument under § 1973 also has no likelihood of success on the merits.  As argued above, nothing beyond bald assertion and unfounded subjective feelings supports Plaintiffs' claim that the Directive discriminates against anyone on the basis of race.  Nothing substantiates Plaintiffs' perceived threat of arbitrary application and unfettered discretion in enforcing the plain and racially neutral terms of the Directive.  Nothing in the history of this Directive or in the training provided by the Defendants supports Plaintiffs' wholly speculative assertions and arguments either.  (Def's Ex 1. ¶¶5,6, 7, 8).  Nor is there factual or legal basis for Plaintiffs' arguments concerning racial discrimination.  With respect to race, the Directive is neutral in its content and reach.  Plaintiffs' conclusory and speculative allegations in affidavits are not adequate to demonstrate the likelihood of proving impermissible racial discrimination or meet the test for summary judgment on this issue.[30]  Again, the directive merely establishes basic conditions for all voters to exercise their rights on an equal footing.  Plaintiffs' argument ignores the manifest neutrality and equality of the terms, intent and effect of the Directive.  At most,

---

[30] *Blackburn v Fisk University*, 443 F2d 121, 124 (CA6 1971); *Cotz v Mastroeni, et al*, 476 F Supp 2d 332, 363-71 (SD NY 2007); *Celotex Corp v Catrett*, 477 US 317, 322; 106 S Ct 2548, 91 L Ed 2d 265 (1986); *Matsushita Electric Industrial Co v Zenith Radio Corp*, 475 US 574, 587, 106 S Ct 1348, 89 L Ed 2d 538 (1986); *Thaddeus-X v Blatter*, 175 F3d 378, 399-400 (CA6 1999).

Plaintiffs' argument suggests a potential for disparate application of the law by individual election inspectors. This does not support any facial invalidity with respect to the Directive, however. Nor does it support issuance of a preliminary or permanent injunction where material issues of fact are unresolved or disputed. Plaintiffs thus have no likelihood of success on the merits with respect to any violation of § 1973.

2.      *The Directive does not violate the Constitution*

These is no constitutional violation here. Plaintiffs invoke the First, Fifth, Fourteenth and Fifteenth Amendments in their Complaint, (Pls.' Compl. at ¶¶ 1-2), and the first of these three in their brief. (Pls.' Br. at 21-22). But the body of their argument only addresses First Amendment law. (Pls.' Br. at 22-28.) Accordingly, Defendants will only respond to the First Amendment arguments, which do not have a likelihood of success on the merits.

a.      *The Directive survives deferential review of neutral election regulations*

"Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections . . . ."[31] "[A]s a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process."[32] "To achieve these objectives, States have enacted comprehensive and sometimes complex election codes."[33] As a result, election laws impose some burden on voters. "'[W]hether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, [election laws] inevitably affects – at least to some degree – the individual's right to vote and his right to associate with others for political ends.'"[34]

---

[31] *Burdick v Takushi*, 504 US 428, 434; 112 S Ct 2059; 119 L Ed 2d 245 (1992).
[32] *Storer v Brown*, 415 US 724, 730; 94 S Ct 1274; 39 L Ed 2d 714 (1974).
[33] *Anderson v Celebrezze*, 460 US 780, 789; 103 S Ct 1564; 75 L Ed 2d 547 (1983).
[34] *Burdick*, 504 US at 433, (quoting *Anderson*, 460 US at 788).

"Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently."[35] Rather, a court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments . . . against the precise interests put forward by the State as justifications for the burden imposed by its rule."[36] Under this test, "severe" burdens on constitutional rights must be "narrowly drawn to advance a state interest of compelling importance."[37]  "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."[38]  No bright line separates permissible election-related regulation from unconstitutional infringements.[39]  The United States Supreme Court has also repeatedly recognized that each inquiry is fact and circumstance specific.

Accordingly, the Court should conclude in this case that the longstanding restrictions of the Directive are reasonable time, place and manner policies that simply set the ground rules for campaigners and voters alike at polling places.  An election is a huge governmental undertaking that requires rules and procedures for orderly and reliable outcomes.  In this context, the Directive is narrowly tailored to achieve this compelling interest.  For the reasons already stated with respect to the Voting Rights Act, the Directive is a reasonable, non-discriminatory and

---

[35] *Burdick*, 504 US at 434.

[36] *Burdick*, 504 US at 434 (internal marks omitted).

[37] *Burdick*, 504 US at 434 (quoting *Norman v Reed*, 502 US 279, 289; 112 S Ct 698; 116 L Ed 2d 711 (1992)).

[38] *Burdick*, 504 US at 434 (quoting *Anderson*, 460 US at 788).

[39] *Timmons*, 520 US at 359; see also *Storer* 417 US at 730  (noting that there is "no litmus-paper test for separating those [election] restrictions that are valid from those that are invidious under the Equal Protection Clause").

neutral regulation that serves the interests of maintaining an orderly election and protecting

voters in the sanctioning of the polling place.  (Defs' Ex 1, ¶¶5, 6, 7).  Further, the burden on

voters is not severe.  As argued above, the Directive's reach is limited in time, place and scope

and it imposes minimal compliance costs with no threat of automatic disenfranchisement (Defs'

Ex 1, ¶¶5-7).  Therefore, the Court should uphold the Directive as reasonable.

> b.     *The Directive survives heightened review and is therefore not
> constitutionally overbroad because it is narrowly tailored to serve the
> compelling interests of ensuring the integrity of the voting process and
> preventing election fraud and voter intimidation.*

The overbreadth doctrine prohibits the government from proscribing a "substantial"

amount of constitutionally protected speech judged in relation to the law's plainly legitimate

sweep.[40]  A finding that is law is overbroad invalidates all enforcement of that law, until and

unless a limiting construction or partial invalidation so narrows it as to remove the seeming

threat or deterrence to constitutionally protected expression.[41]  Because the overbreadth doctrine

creates substantial social costs, the Supreme Court has instructed that a law's application to

protect speech be substantial relative to the scope of the law's plainly legitimate applications

"before applying the strong medicine of overbreadth invalidation."[42]  As such, the overbreadth

doctrine is only to be used as a last resort.[43]  Plaintiffs have failed to address these significant

issues in their overbreadth challenge.  The case law they rely on compels the conclusion the

Directive has a constitutionally legitimate sweep that does not implicate a substantial amount of

protected speech.  The Directive, thus, withstands the "strong medicine of overbreadth

invalidation."

---

[40] *Virginia v Hicks*, 539 US 113, 118-119; 123 SCt 2191; 156 Led 2d 148 (2003).
[41] *Virginia v Hicks*, 539 US at 119-120.
[42] *Virginia v Hicks,* 539 US at 119-120.
[43] *Broadrick v Oklahoma*, 413 US at 613; *Sensations, Inc v City of Grand Rapids*, 526 F3d 291, 300 (CA6, 2008).

Plaintiffs identify *Burson v Freeman*[44] and *Anderson v Spear*[45] as the key authority governing this dispute, but they apply the holdings of each case incorrectly.  In *Burson*, the United States Supreme Court upheld the constitutionality of a Tennessee statute establishing a 100-foot zone around polling places where the solicitation of votes and the display or distribution of campaign materials were forbidden.[46]  The Tennessee statute designated "an election-day 'campaign-free zone'" that barred within the 100-foot zone "the *display* of campaign posters, signs or *other campaign materials*, distribution of campaign materials, and solicitation of votes for or against any person or political party or position . . . .'"[47]  The *Burson* Court rejected the Plaintiffs' challenge to the statute under the First and Fourteenth Amendments.[48]  The plurality identified "three central concerns in our First Amendment jurisprudence" that the statute implicated: regulation of political speech, regulation of speech in a public forum,[49] and regulation based on the content of the speech.  The plurality therefore applied strict scrutiny review to the Tennessee statute and held that it qualified as "the rare case in which we have held that a law survives strict scrutiny."[50]

The plurality upheld Tennessee's statute for reasons that apply with equal force to the Directive that is challenged here.  Like the statute challenged in *Burson*, a court would likely consider the Directive to be a "facially-based restriction on political speech in a public forum

---

[44] *Burson v Freeman*, 504 US 191; 112 S Ct 1846; 119 L Ed 2d 5 (1992).

[45] *Anderson, et al v Spear, et al*, 356 F3d 651 (CA 6 2004).

[46] *Burson*, 504 US at 210-11.  The Court should note that only eight Justices participated in the decision in *Burson*.  Four Justices (Blackmun, Rehnquist, White and Kennedy) joined in the lead opinion and Justice Scalia concurred in the judgment on different grounds.

[47] *Burson*, 504 US at 193 (quoting Tenn Code Ann § 2-7-111(b)) (emphasis added).

[48] *Burson*, 504 US at 193, 210-11; 504 US at 214-216 (Scalia, J., concurring).

[49] Justice Scalia reasoned that a polling place is not a traditional public forum and that Tennessee's statute should be upheld as reasonable and viewpoint neutral.  504 US at 214-216 (Scalia, J., concurring).

[50] *Burson*, 504 US at 198, 211.

21

[that] must be subjected to exacting scrutiny."[51]  Strict scrutiny requires the State to show that the "regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."[52]

Tennessee advanced two compelling interests that are served by campaign-free zones: "protecting the rights of its citizens to vote freely for the candidates of their choice . . . . [and] protect[ing] the right to vote in an election conducted with integrity and reliability."[53]  The plurality agreed, stating that "[t]he interests advanced by Tennessee obviously are compelling ones."[54]  The plurality reviewed case law holding that the right to vote freely is "the essence of a democratic society" and that a State has a compelling interest in protecting voters from confusion and undue influence, preserving the integrity and reliability of its election process and ensuring that an individual's right to vote is not undermined by fraud in the election process.[55]  Under *Burson*, it cannot be disputed that Defendants have a compelling interest in ensuring the integrity of the voting process and preventing voter intimidation and election fraud.

The plurality in *Burson* detailed the history of the evils of voter intimidation and election fraud,[56] concluding that the collected experience and attendant wisdom of local election officials in America "settled on the same solution: a secret ballot secured in part by a restricted zone

---

[51] *Burson*, 504 US at 198.

[52] *Burson*, 504 US at 198 (quoting *Perry Ed Assn v Perry Local Educators' Assn*, 460 US 37, 45; 103 S Ct 948; 74 L Ed 2d 794 (1983)).

[53] *Burson*, 504 US at 198-99.

[54] *Burson*, 504 US at 199.

[55] *Burson*, 504 US at 199 (citing *Reynolds v Sims*, 377 US 533, 555; 12 L Ed 2d 506; 84 S Ct 1362) (1964); *Eu v San Francisco Cty Democratic Central Comm*, 489 US 214, 228-29; 103 L Ed 2d 271; 109 S Ct 1013 (1989); *Anderson v Celebrezze*, 460 US 780, 788, n9; 75 L Ed 2d 547; 103 S Ct 1564 (1983) (collecting cases)).

[56] *Burson*, 504 US at 200-06) (summarizing history from the colonial experience, Australia, England, Michigan, Wisconsin, Kentucky, Massachusetts, New York and Tennessee and noting that "[t]oday, all 50 States limit access to the areas in or around polling places").

around the voting compartments."[57]  "We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud."[58]  Importantly, the plurality reasoned that the restricted zones are not overinclusive because a statute forbidding only the most blatant and specific attempts to impede elections would not serve the compelling interests at stake because "many acts of interference would go undetected [and t]hese undetected or less than blatant acts may nonetheless drive the voter away before remedial action can be taken."[59]

This analysis is key here because Plaintiffs argue that the statute is overbroad and it sweeps up in its prohibition the political symbolic speech of even the most, it is asserted, unobtrusive and non-disruptive voter who simply wears a campaign button.  The weight of the compelling interests at play and the rationale of *Burson* justify the Directive's restriction against all campaign material within the narrowly confined 100-foot zone surrounding polling places. The Court should also note that the Tennessee statute upheld in *Burson*, like the Directive at issue here, forbade within the same zone "the *display* of campaign posters, signs or *other campaign materials* . . . ."[60]  Because the breadth of the Directive and the Tennessee statute are the same, the Directive is not susceptible to Plaintiffs' argument that it is unconstitutionally overbroad.

With respect to narrow tailoring, the plurality in *Burson* concluded that a 100-foot zone is permissible.  "We do not think that the minor geographic limitation prescribed by § 2-7-111(b) constitutes such a significant impingement."[61]  The plurality reasoned that a conceivably tighter zone raises no question of constitutional dimension.  Citing the dissenting opinion in the

---

[57] *Burson*, 504 US at 206.
[58] *Burson*, 504 US at 206.
[59] *Burson*, 504 US at 206-07.
[60] *Burson*, 504 US at 193 (quoting Tenn Code Ann § 2-7-111(b)) (emphasis added).
[61] *Burson*, 504 US at 210.

Tennessee Supreme Court, which noted that it takes about 15 seconds to walk 75 feet, the

plurality opined[62]:

> The State of Tennessee has decided that these last fifteen seconds before its citizens enter the polling place should be their own, as free from interference as possible.  We do not find that this is an unconstitutional choice.
>
> * * *
>
> Accordingly, it is sufficient to say that in establishing a 100-foot boundary, Tennessee is on the constitutional side of the line.
>
> In conclusion, we reaffirm that it is the rare case in which we have held that a law survives strict scrutiny. This, however, is such a rare case. Here, the State, as recognized administrator of elections, has asserted that the exercise of free speech rights conflicts with another fundamental right, the right to cast a ballot in an election free from the taint of intimidation and fraud. A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect that fundamental right. Given the conflict between these two rights, we hold that requiring solicitors to stand 100 feet from the entrances to polling places does not constitute an unconstitutional compromise.

Similarly, Defendants in this case did not make an unconstitutional choice when they

decided that a voter's environment and the last moments before voting should "be their

own, as free from interference as possible."[63]

There is no reasoned basis for distinguishing the Tennessee statute from Michigan's law

and Defendants' interpretation and guidance.  The Tennessee statute and MCL 168.744 establish

the same 100-foot campaign-free zone and they are both viewpoint neutral restrictions on all

campaign materials within that zone.  Both obviously also apply within a polling place itself.

The holding of *Burson* hinged in no way upon whether the restrictions applied to campaigners or

to voters.  The policy that was upheld in *Burson* as adequately narrowly tailored was a blanket

removal of all such speech, for otherwise the campaign-free zone would be a misnomer.  The

---

[62] *Burson*, 504 US at 210-11 (citation omitted).
[63] *Burson*, 504 US at 210.

Court need look no further than *Burson* to conclude that Plaintiffs have no likelihood of success on the merits of their constitutional argument.

Any attempt by Plaintiffs to distinguish *Burson* as applying to campaigners and not to voters must fail.  The Tennessee statute banned the display of campaign materials in the buffer zone regardless of who caused the display.  The holding turned in no way upon how active or passive, entreating or non-entreating, overt and non overt the display was.  The intent to persuade was not a factor in the decision.  Rather, it turned on the display of campaign materials in close proximity to the polling place.

It is worth repeating additional practical considerations that make the Directive narrowly tailored and therefore not constitutionally impermissible.  The Directive is limited in time to the thirteen hours of the handful of days a year when the people of Michigan go to vote.  For individual voters, the time is further constrained to the short period of time between when they enter, vote and then exit the polls.  The Directive is confined in space to the immediate vicinity of voting.  Finally, there is no automatic sanction that requires election officials to precipitously deny anyone the right to vote.

Compliance with the Directive is temporary and easy, as campaign buttons, hats and other small accessories can be removed and placed out of sight with little difficulty.  If November weather is, consistent with previous experience, chilly as expected, then covering campaign clothing is as simple as closing a winter overcoat.  For this purpose, election officials might loan out extra coats or coverings on a temporary basis, much like a restaurant or a religious attraction that adheres to a strict dress code.  In the absence of such garments, election officials can direct the voter to a nearby bathroom or other private area where such clothing could be turned inside out.  Voters wearing multiple layers of clothes can simply remove the prohibited article.  If these options are impracticable and time allows, then in the rare case a

voter might be instructed to return home to change clothes.  This inconvenience is justified, as explained above, for the reasons that underlie the State's compelling interest in ensuring the integrity of the voting process, providing a safe voting environment free from electioneering and campaigning and preventing election fraud and voter intimidation.  The limited practical effect of the Directive undercuts Plaintiffs' contention that any injury in fact is present in this case.

Plaintiffs have no basis to assume that extreme coercion would be the rule and not the exceedingly rare exception.  Indeed, the very terms of the Directive mention calling the local clerk before contacting law enforcement and only *after* a person *persists* in violating any restrictions.  Plaintiffs' theory of injury skips the first several reasonable steps that voters and election officials alike can take together to make the Directive work as intended.  Plaintiffs' attempt to cast the Directive in the most extreme light betrays the lack of any cognizable constitutional argument for invalidating the Directive.  The narrow reach of the Directive ensures that Plaintiffs have no likelihood of success on the merits of their constitutional challenge.

In *Anderson*, the Sixth Circuit applied *Burson* when it invalidated a 500-foot campaign-free zone restriction in Kentucky.  Importantly, the Sixth Circuit viewed the exacting review of *Burson* as something less than strict scrutiny but instead a "modified burden of proof" under which "the state must demonstrate that its response is 'reasonable and does not *significantly impinge* on constitutionally protected rights."[64]  The Sixth Circuit held that *Burson* referred to narrow tailoring but that "it later applies the loosened requirement which gives deference to a state regulation so long as it is reasonable and does not significantly impinge on constitutionally

---

[64] *Anderson*, 356 F3d at 656 (quoting *Burson*, 504 US at 209, 209 n11) (emphasis in original)).

protected rights."[65]   Applying this modified standard of review, the Sixth Circuit found that "the 500-foot buffer zone [was] facially overbroad."[66]

Anderson reasoned that the "extreme geographic distance" involved would cover an area 25 times larger than the area allowed in Burson, creating 18 square acres of political silence around a voting booth and preventing campaigners from coming within the length of 1 and 2/3 football fields of the polling place.[67]   The Sixth Circuit held that the evidence "suggests that the buffer zone was intended to cut off all electioneering speech."[68]   Finally, the Sixth Circuit applied a narrowing construction to the statute's use of "electioneering," holding that "it may permissibly apply only to speech which expressly advocates the election or defeat of a clearly identified candidate or ballot measure."[69]

Anderson also offers Plaintiffs' constitutional argument no more likelihood of success. First, the holding of Anderson is limited by the simple fact that it decided a case that sought to expand the 100-foot rule of Burson to a new limit of 500 feet.  Because MCL 168.744 adheres to the authoritatively upheld 100-foot buffer zone, the effect of Anderson on this case is nil. Second, even if Anderson has precedential value here, its reach would work to the benefit of Defendants' position because Anderson read Burson as applying a "loosened" exacting standard of review.  Logically, it must therefore be the case that a 100-foot buffer zone that survived strict scrutiny would also pass muster under the modified burden of proof.  Finally, the limiting construction of electioneering that the Sixth Circuit crafted in Anderson is not needed for the Directive, which confines its restriction to campaign buttons, accessories and clothing "bearing a campaign slogan or a candidate's name."  These restrictions overlap with the Sixth Circuit's

---

[65] Anderson, 356 F3d at 657.
[66] Anderson, 356 F3d at 657.
[67] Anderson, 356 F3d at 661-62.
[68] Anderson, 356 F3d at 661.
[69] Anderson, 356 F3d at 665.

articulation of a narrowing construction applying "to speech which expressly advocates the election or defeat of a clearly identified candidate or ballot measure."[70]  To the extent that *Burson* and *Anderson* are inconsistent, the rule of *Burson* must control because it was decided by the United States Supreme Court.

<div align="center">

c.     *Burson also permits regulation of symbolic speech*

</div>

Plaintiffs' argument concerning symbolic speech is similarly without merit.  Plaintiffs plan to wear "paraphernalia expressing certain views symbolic of an act within the Free Speech Clause of the First Amendment."  (Pls.' Br. at 28).  But under *Tinker*[71] it is the speech and not the views that must be symbolic.  In the case of campaign shirts and accessories, express written slogans often accompany whatever symbols are displayed.  Further, Plaintiffs assert they are engaged in symbolic expression yet deny that the message resembles active campaigning.  For reasons already stated above, displaying campaign material on Election Day in a polling place, where bystanders are a captive audience approaching their solemn moment of decision, cannot be logically divorced from the intent and effect of expressly endorsing particular candidates or ballot proposals.

Moreover, the nature of the speech, be it express or symbolic, made no material difference in *Burson*.  A prohibited display can be express, implied, symbolic, loud, quiet, dignified, undignified, etc.  *Burson* drew a clear line where Defendants are permitted to regulate Plaintiffs' speech, and it matters not whether that speech is considered symbolic.

For all these reasons, Plaintiffs have no likelihood of success on the merits of their constitutional challenge.  *Burson* authoritatively upheld time, place and manner restrictions identical in substance to the Directive and *Anderson* does not alter the legal landscape.

---

[70] *Anderson*, 356 F3d at 665.
[71] *Tinker v Des Moines Indep Cmty Sch Dist*, 393 US 503; 89 S Ct 733; 21 L Ed 2d 731 (1969).

C.       Plaintiffs have not shown that they or their members will suffer irreparable harm.

In addition to failing in their burden of demonstrating a substantial likelihood of success on the merits of their claims, Plaintiffs fail to show that they or their members will suffer irreparable harm absent the issuance of an injunction.

For the reasons articulated above, Defendants submit that Plaintiffs must come forward with more than speculative assertions that individuals will be disenfranchised or that the Directive will be implemented in an arbitrary or discriminatory manner.  MCL 168.744 has been the law for decades, and the Directive is no different from the instructions issued in previous years.  They are consistent with federal and State law.  They are designed to enable the right to vote, not to take it away from anyone improperly or on a discriminatory basis.  Regulations like the Directive exist to prevent irreparable harm to voters in Michigan's polling places.  The voters depend upon Defendants and other governmental officials to ensure for them that the compelling interests explained above are served and that their right to vote in a proper manner and an appropriate environment are respected.  Plaintiffs have not demonstrated any irreparable harm that would weigh in favor of granting a preliminary injunction.

D.       The balance of hardships weighs against granting an injunction, and the public interest will not be advanced by the granting of an injunction in this case.

Defendants will suffer significant harm if a preliminary injunction is granted.  An injunction will negatively affect Defendants duty and ability to ensure a fair and orderly election, and that fact, in and of itself, negates any advancement in the public interest by the granting an injunction.  The late timing of Plaintiffs' request is relevant, as the hearing on their request for injunctive relief is scheduled for a mere eight days before the general election.  It would be unduly burdensome for Defendants to disrupt their operations at this late stage in the event that the Court grants injunctive relief that would change the status quo.

Finally, the public interest is consonant with the compelling State interests implicated here.  The ground rules for conducting an orderly and reliable general election must not be altered in haste or upon as weak a showing as Plaintiffs present here.  The essence of democratic self-government depends upon the effective exercise of voters' rights to freely choose their representatives.[72]  Established law has determined that in limited circumstances such as these political speech must give way to the equally important and fundamental right of voters to freely vote and the State to set the conditions for voting.  Outside of the 100-foot zone, free speech reigns, as it should.  Public confidence in the proper balance of rights depends upon the well-founded belief that the rules of the system are reasoned, justified and not cavalierly discarded.  A grant of a preliminary injunction in this case would rock the foundation of that important belief.

### IV.    The doctrine of laches bars Plaintiffs' claims.

The defense of laches "requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense."[73]  The doctrine "is based upon [the] maxim that equity aids the vigilant and not those who slumber on their rights. It is defined as neglect to assert a right or claim which, taken together with lapse of time and other circumstances causing prejudice to the adverse party, operates as bar in court of equity."[74] In an election case, the Sixth Circuit has held that "[a]s time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the [plaintiff's claim] becomes less credible by his having slept on his rights."[75]

---

[72] *Reynolds*, 377 US at 555.
[73] *Kansas v. Colorado*, 514 U.S. 673, 687; 115 S Ct 1733; 131 L Ed 2d 759 (1995) (quoting *Costello v United States*, 365 US 265, 282, 5 L Ed 2d 551, 81 S Ct 534 (1961)).
[74] *Black's Law Dictionary* at 875 (6th Ed 1990).
[75] *Kay v Austin*, 621 F2d 809, 813 (CA6 1980).

In this case, there is no reasonable explanation for why Plaintiffs waited until the virtual eve of Election Day before they filed this suit.  The training manual that they now challenge was released in February, at least eight months before Plaintiffs filed suit.  Its contents are not materially different from the instructions promulgated in previous years.  (Defs.' Ex. 1, ¶6). Plaintiffs are silent about when they learned of the Directive and how soon that happened before filing in federal court.  They apparently sought no legal relief before, during or after the Directive was in effect for the 2008 primary election and elections in years past.  By filing less than three weeks before the general election, Plaintiffs manufactured an urgency that should not devolve to their benefit in seeking a preliminary injunction.  Because time is short, Defendants are limited in their ability to marshal a reasoned and proper defense, all in the context of a truncated procedural context for a motion seeking preliminary and permanent injunctive relief at a hearing that is a mere eight days before the election.  Further, had Plaintiffs acted earlier, Defendants would have had additional opportunity to better educate the public about the time, place and manner restrictions that are now being challenged.  Defendants will be prejudiced if the Court allows Plaintiffs to capitalize upon the late timing of this lawsuit.  The Court should also consider the pitfalls of deciding this case in haste.[76]

### V.    Plaintiffs' claim is not yet ripe.

The doctrine of ripeness precludes federal courts from adjudicating cases that depend upon "contingent future events that may not occur as anticipated, or indeed may not occur at

---

[76] *See e.g. Purcell v Gonzalez*, 127 S Ct 5, 7 (2006) (holding that court orders resulting in higher risk of voter confusion and apathy increases as an election draws closer); *Williams v Rhodes*, 393 US 23, 34-35 (1968) (affirming denial of request for injunction requiring last-minute changes to ballots given risks of disrupting election process); *Reynolds v Sims*, 377 US 533, 585 (1964) (holding that "court can reasonably endeavor to avoid a disruption of the election process which might result from requiting precipitate changes").

all."[77]  Ripeness is "a question of timing" whose "basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements."[78]  The Court should evaluate the fitness of the issues for judicial decision and the hardship to parties of withholding court consideration."[79]

In this case, Plaintiffs' problems with standing apply with equal force to the ripeness doctrine.  They claim injuries that have not happened and, if they happen at all, will not happen until Election Day.  Before that point in time, the nature and contours of Plaintiffs' claims, if any, cannot be known.  The complaint assumes future events that may not occur in the way that Plaintiffs envision, if at all.  In particular, the manner of enforcement of the Directive is not known and can take the various forms that were described above, all well short of forcibly disenfranchising a voter after calling local law enforcement to respond to a public disturbance. At this point, the controversy is abstract and lacking specific content.

With respect to hardship, the best approach is to leave the status quo undisturbed. Because, for the reasons explained above, there is no basis for Plaintiffs' subjective fear of disenfranchisement, there can be no hardship imposed on Plaintiffs if the court refrains from adjudicating the case.  The only effect is psychic uncertainty about imagined threats to rights that in reality are safe.  Adjudicating the matter, however, will place Defendants in the untenable position of defending a practice and policy that has claimed no victim.  Defendants would be forced to divert significant attention and resources away from an orderly Election Day and devote them to litigating unproven and speculative theories of injury-in-fact.  Under these

---

[77] *Texas v United States*, 523 US 296, 300; 118 S Ct 1257; 140 L Ed 2d 406 (1998) (citations omitted)

[78] *Thomas v Union Carbide Agric Prods Co*, 473 US 568; 580 105 S Ct 3325; 87 L Ed 2d 409 (1985) (quoting *Regional Rail Reorganization Act Cases*, 419 US 102, 138-39 (1974); *Abbott Laboratories v Gardner*, 387 US 136, 148 (1967)).

[79] *Texas*, 523 US at 300-01.

circumstances, the Court should not delve any further into this case.  Dismissal under the

ripeness doctrine is altogether appropriate.

## CONCLUSION AND RELIEF SOUGHT

Defendants respectfully request that this Court dismiss Plaintiffs' claims for lack of standing, under the doctrines of ripeness and laches and because the Court in its discretion will not exercise jurisdiction over this declaratory action. On the merits, Defendants respectfully request that this Court deny Plaintiffs' request for a preliminary injunction because Defendants have demonstrated that Plaintiffs have no likelihood of success on the merits, Plaintiffs will suffer no irreparable harm, but Defendants will suffer harm, and that the public interest will not be served by granting the motion.

Defendants further request the Court deny Plaintiffs' motion for declaratory judgment and permanent injunction because the requested relief is not supported by the facts or applicable law. Plaintiffs effectively seek summary judgment on their complaint which is not supported by the record or the law. Alternatively, the Court should dismiss this case pursuant to FRCivP12(b)(1) and (6) or pursuant to FRCivP56(b) and (c)

<div style="margin-left:40%">

Respectfully submitted,

MICHAEL A. COX
Attorney General

*s/John G. Fedynsky*
John G. Fedynsky (P65232)
Heather S. Meingast (P55439)
Margaret Nelson (P30342)
Assistant Attorneys General
Attorneys for Defendants Land & Thomas
PO Box 30736
Lansing, Michigan  48909
517.373.6434
Email:  fedynskyj@michigan.gov

</div>

Dated:  October 24, 2008
20083032628A/resp01

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2008, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing as well as via U.S. Mail to all non-ECF participants.

*s/John G. Fedynsky*
John G. Fedynsky (P65232)
Heather S. Meingast (P55439)
Margaret Nelson (P30342)
Assistant Attorneys General
Attorneys for Defendants Land & Thomas
PO Box 30736
Lansing, Michigan  48909
517.373.6434
Email: fedynskyj@michigan.gov